IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LYNN STALLWORTH**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2:23cv1638 |
| ) | **Electronic Filing** |
| **WEIBLINGER'S RESIDENTIAL CARE,** ) | |
| **INC.**, ) | |
| ) | |
| Defendant. ) | |

## OPINION

Lynn Stallworth ("plaintiff") filed a complaint against Weiblinger's Residential Care, Inc. ("defendant"), seeking redress for hostile work environment and retaliation under Title VII and the Pennsylvania Human Relations Act. Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, the motion will be granted.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(E)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" ... "and cannot simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment.").  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary

judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50; <u>see</u> <u>also</u> <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992), <u>cert.</u> <u>denied</u>, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record read in the light most favorable to plaintiff establishes the background set forth below. Defendant provides residential care for adults with intellectual and mental disabilities living independently. Plaintiff is an African American woman. On September 26, 2022, defendant hired plaintiff as a direct support professional ("DSP"). As a DSP, plaintiff assisted clients with daily living activities.

On October 5, 2022, plaintiff attended orientation and training at defendant's corporate office. Defendant's head human resources director, Richard Rubin, led the training session one-on-one. During training, Rubin instructed defendant not to swear around the clients because the clients had a demonstrated tendency to repeat unsavory language. With further anecdotal specificity and as an example, Rubin told plaintiff not to speak the "A-word," the "B-word" and the F-bomb."[1] He then gave an example which plaintiff recounts as follows: "this guy was on the phone and the person he was on the phone with was saying the word nigga and the client started saying it and that I shouldn't say the nigga word because you can't say nigga around clients because they'll -- they'll repeat it." Plaintiff's Deposition (Doc. No. 27-2) at p. 7.

Upset with Rubin's language, plaintiff left the training session to use the restroom. There, defendant's program manager, Gina Marbury overheard plaintiff discussing Rubin's actions on the phone. Hearing this, Marbury intervened and discussed the matter with plaintiff. Plaintiff expressed a desire to terminate her employment immediately, but Marbury convinced plaintiff to

---

[1] Rubin used these abbreviations of the words when speaking to plaintiff.

accompany Marbury to her superior's office to report the incident. When approaching the supervisor's office, Marbury made a comment to the supervisor that "Rick did something else again." Id. at p. 14. With Marbury, plaintiff described the incident with Rubin to Chief Operating Officer, Brian Wankiiri.

Defendant then had plaintiff speak with defendant's certified internal investigator, Bill Milligan. Additionally, plaintiff voluntarily drafted a handwritten statement regarding the incident. Marbury also spoke with Milligan and drafted a handwritten statement. Milligan then conducted an investigation and concluded that "[Rubin] used the racial slur not in malice but in ignorance." Weiblinger's Residential Care Internal Investigation of October 13, 2022 (Doc. No. 27-3) at p. 4. Based on Milligan's findings, defendant determined that the incident was insufficient to warrant suspension but required Rubin to take a class on sensitivity and tolerance. It also ended one-on-one training sessions and mandated that a second staff member be present at all times. Id. Plaintiff never had any contact with Rubin after the initial incident.

When defendant hired plaintiff, defendant offered all new DSPs the opportunity to earn a total cash bonus of $5,000 if the DSP took additional shifts with clients that management labeled as "difficult." For each weekly shift worked with a "difficult" client, the new DSP would be entitled to a one-time $1,000.00 bonus. Plaintiff applied to be a DSP with defendant because of this bonus. On October 7, 2022, Marbury texted plaintiff to discuss her availability to coordinate a schedule to work towards the $5,000.00 bonus. The two discussed the specific requirements to receive the bonus via text. Marbury stated she believed that plaintiff would receive "$1,000.00 per shift at a difficult site," but that she would need to confirm with Wankiiri. Plaintiff replied to this message with a "thumbs-up" emoji.

On October 8, 2022, Marbury texted plaintiff confirming the bonus structure. Marbury further informed plaintiff that plaintiff's current assignment qualified for the bonus. A week later, on October 15, 2022, plaintiff texted Marbury regarding an incident with a "difficult" client. The client had made plaintiff feel unsafe. On October 22, 2022, plaintiff contacted Marbury stating she had not been scheduled for that day. Marbury informed plaintiff that she had been left off the schedule for her own safety because the same client had made threats regarding plaintiff. As an alternative, Marbury offered plaintiff the opportunity to shadow her so that plaintiff could still get her hours.

Plaintiff next communicated with Marbury on October 24, 2022. Plaintiff texted Marbury that returning would be "too stressful" and that "[work] left a really bad taste in my mouth, affected my mental health, [and] got me snapping at my kids[.]" Plaintiff concluded her text by stating: "Sorry, I quit."

Plaintiff timely filed and exhausted her administrative remedies. On September 12, 2023, the instant complaint for relief was filed.

Defendant moves for summary judgment on several grounds. First, defendant contends that plaintiff admittedly requested to work with difficult patients and therefore cannot establish a materially adverse employment action as needed for a prima facie case of retaliation under Title VII. Second, plaintiff assertedly cannot establish a foundation for a claim of disparate treatment and/or constructive discharge because she chose to work with difficult clients, was removed from her initial assignment in order to protect her from a threatening client and admittedly resigned because of the stressful environment that working with such a client had created. Third, plaintiff purportedly fails to establish a claim for a race-based hostile work environment because she has not shown that the single incident by Rubin was directed at her because of her race, that she

suffered anything more than some isolated discomfort on the day it happened, and that the incident did not sufficiently permeate the work environment with race-based hostility. Finally, defendant maintains that plaintiff's PHRA claims fail for all these same reasons.

In response, plaintiff maintains that defendant subjected her to a racially hostile work environment through the severity of Rubin's conduct during plaintiff's initial orientation and then retaliated against her after this event.[2] Specifically, Rubin's use of the racial slur was so upsetting that plaintiff left the training and broke down in the restroom while recounting the event to a friend. Marbury overheard her and immediately offered to assist in making a formal complaint. Defendant then assigned plaintiff to work with a hostile and violent client, whereupon plaintiff became involved in incidents involving the police, an ambulance and the hospital. Although plaintiff complained to Marbury, defendant assertedly did nothing to alleviate the situation. It also did not discipline Rubin. Consequently, plaintiff maintains that the work environment forced her to resign.

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000 e–2(a)(1). The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [protected employees] in employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). "Title VII is violated 'when the workplace is permeated with discriminatory [race-based] intimidation,

---

[2] In her response to defendant's motion for summary judgment, plaintiff does not address defendant's contentions as they otherwise relate to her claims for disparate treatment and retaliation in counts one, two and three.

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 215 (1993)). Title VII is designed to protect against "working environments [that are] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." Meritor, 477 U.S. at 66 (quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).

A plaintiff alleging a racially hostile work environment must establish the following elements: (1) the employee suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001). Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. Id. at 280-281.

Defendant challenges plaintiff's ability to satisfy the first element – that the conduct in question was directed at her because of her race. It is well-settled that a plaintiff need not produce direct evidence of an actor's motivation for conduct that can be found to be discrimination. Abramson, 260 F.3d at 278. In this regard it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind. Id. at 277-78. Instead, "[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the

plaintiff's] treatment was attributable to her [race]." Id. at 277.  In this context a plaintiff is not "required ... to demonstrate direct proof that her harasser's intent was to create a discriminatory environment." Id. at 278.  Instead, the intent to discriminate can be inferred from the entire context in question and the conduct of the actors involved.  Thus, "[r]egardless of what a harasser's intention is, if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that her 'work-place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and the conduct is based on one of the categories protected under Title VII, a hostile work environment claim will survive summary judgment." Id. at 278-79.  In other words, "where ... the evidence tends to show that the harasser's conduct was intentionally directed toward the plaintiff because of her [race], the first prong of the prima facia case is met." Id. at 279.

Of course, plaintiff is not required to demonstrate that each of the incidents forming the basis of her hostile work environment claim has a direct link to or creates an inference of conduct motivated by race-based discriminatory animus.  That is not the test which this court must apply.  See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999) (district court appropriately refused to consider the defendant's attempt to disaggregate the various acts and endeavors forming the plaintiff's hostile work environment claim and cast doubt on each one, and properly evaluated the record as a whole).  Instead, it must determine whether a reasonable factfinder could view the evidence as showing plaintiff's treatment was attributable to her race.  And the evidence need not establish a direct intent to discriminate, but merely must be capable of proving that the conduct in question as a whole was directed toward the plaintiff because of her race.  In making this evidentiary assessment, the court is not permitted to act as a factfinder and

resolve the differing inferences that can be drawn from the evidence. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000). Instead, the evidence must be considered in the light most favorable to the non-movant, with all reasonable inferences being drawn in that party's favor. Id.

Here, plaintiff cannot establish that defendant targeted plaintiff because of her race. Plaintiff attempts to sidestep this element by implying Rubin chose that specific anecdote and spoke the slur aloud because plaintiff is African American. In support of this position, plaintiff offers Rubin's flippant assertion that he could use such language because he attended diversity training. In addition, the aspects of the record indicating plaintiff became upset after hearing the narrative and Marbury immediately sought to comfort plaintiff and assist her in making a report of the incident provide some circumstantial evidence from which the factfinder could determine Rubin's intent. If these components of the record provided the entire account of the event, the inference that Rubin directed the vignette at plaintiff because of her race would be sufficient to create a triable issue. But plaintiff's own testimony undercuts any such inference.

Rather crucially, plaintiff testified Rubin did not use the language with a racist tilt. Instead, she opined that "[Rubin] was using [the slur] in the context as like you would to talk to a friend, like a nickname you would have for a friend. Like in a - - almost endearing kind of way." Plaintiff's Deposition, (Doc. No. 27-2) at 33. In light of this evidence and viewing the evidence as a whole, the evidence is insufficient to create a dispute of material fact as to whether Rubin intended to subject plaintiff to racial harassment through a pernicious anecdote. To the contrary, the record will only support a finding that Rubin stumbled through a teaching moment and made the statement "ignorantly but without malice." In other words, a reasonable factfinder could not

9

view the evidence as showing that defendant's treatment of plaintiff was attributable to her race. Therefore, plaintiff cannot establish the first element of a hostile work environment.

But even assuming for the sake of argument that plaintiff could satisfy the first element, her claim for hostile environment still would fail because she cannot establish that she suffered severe or pervasive harassment. In general, the Supreme Court's cases in the arena have taken a "middle path between making actionable conduct that is merely offensive and requiring conduct to cause a tangible psychological injury." Harris, 510 U.S. at 21. Striking such a balance is necessary to maintain the distinction between objectively hostile or abusive work environments that violate Title VII's broad rule of workplace equality and simple teasing, offhand comments and isolated incidents that are beyond its reach. Id; Clark County v. Breeden, 532 U.S. 268, 271 (2001). The Supreme Court has emphasized that the standards for judging hostility must remain sufficiently demanding so that Title VII does not become "a general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). "The question of 'whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Moody v. Atlantic City Board of Ed., 870 F.3d 206, 214 (3d Cir. 2017) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)).

The workplace conduct underlying a hostile work environment claim is not to be measured in isolation. Rather, it must be assessed "by looking at all the circumstances." Clark County, 532 U.S. at 270. In analyzing whether a plaintiff has established a prima facie case, the court cannot confine its analysis to "individual pieces of evidence alone," but must "view the record as a whole picture." Id. at 276 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d

Cir. 1997)). This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).

Here, the record clearly supports a finding that the harassment occurred in one isolated incident. A single incident of discriminatory treatment can satisfy the "severe or pervasive" element of a hostile work environment claim. Castleberry v. STI Group, 863 F.3d 259, 264-66 (3d Cir. 2017) (citing Faragher, 524 U.S. at 788 ("isolated incidents" will amount to harassment if "extremely serious") (quotations omitted); Breeden, 532 U.S. at 270 (2001) (per curiam) (quotations omitted) (same); and Jensen, 435 F.3d at 449 n.3 (same)). Whether a single incident in the workplace can rise to the level of severity needed to be actionable is a context-specific inquiry. Castleberry, 863 F.3d at 264. But pursuant to that inquiry the incident must "be extreme" for it "to amount to a change in the terms and conditions of employment" and serve as the basis of a harassment claim. Id. (citing Faragher, 524 U.S. at 788).

Here, during one-on-one training, Rubin gave plaintiff a prior example of what-not-to-do when speaking with clients. In poor taste, he spoke the language a previous employee had used to a client and in doing so conveyed an anecdote demonstrating how clients could repeat the language spoken in their presence. In providing the example, Rubin chose to speak a racial epithet aloud. Plaintiff concedes that Rubin did not provide the example in a way that was intended to be derogatory or demeaning to plaintiff because of the color of her skin or her racial heritage. To the contrary, she testified that Rubin did not use the epithet to directly disparage, insult, or intimidate her. Given these context-specific circumstances, a reasonable finder of fact

11

could not conclude that the offhanded anecdote was so extreme that it altered the terms and conditions of plaintiff's employment.

Plaintiff's attempt to bolster the discriminatory severity of Rubin's vignette by highlighting that defendant failed to discipline Rubin is unavailing. This argument is both unsupported and unpersuasive.

To be sure, an employer's failure to take adequate measures to control or eliminate ongoing harassment in the work environment can contribute to its severity and/or pervasiveness. See, e.g., Thomas v. Bronco Oilfield Services, 503 F. Supp.3d 276, 299 (W.D. Pa. 2020) (recognizing that a supervisor's toleration of harassing conduct can contribute to the severity or pervasiveness of workplace hostility). That said, plaintiff has failed to advance any record evidence to support her contention that defendant's handling of the incident led to additional or other incidents of harassment. What the record does show is plaintiff and her supervisor, Gina Marbury, immediately brought Rubin's comments to the attention of Brian Wankiiri. Defendant then conducted an investigation. Rubin was required to attend sensitivity training. Rubin and plaintiff never had contact again.

Plaintiff insists that defendant's course of action fails to constitute discipline. Plaintiff's Brief in Opposition to Motion for Summary Judgment, (Doc. No. 31) at 11. Such a failure, plaintiff implicitly reasons, is evidence that defendant tacitly inculcated a pervasive hostile work environment. However, the only fact plaintiff cites to support the notion that the environment was made worst by defendant's response is that Rubin was not disciplined beyond being required to attend sensitivity training. Plaintiff has not offered any facts on how this asserted lack of discipline impacted her actual working environment.

As previously noted, the non-moving party cannot "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs" to create an issue of material fact. Harter, 967 F.2d at 852. There is no genuine dispute of material fact that defendant investigated the matter and took measures to address Rubin's misconduct. And defendant changed its training protocol to avoid any similar incidents in the future. Plaintiff has no evidence that this state of affairs impacted or otherwise altered her day-today work environment. Thus, the measures defendant took to address Rubin's conduct add nothing to the assessment that plaintiff lacks sufficient evidence to satisfy the severe or pervasive element.

Plaintiff implies that Marbury's comment that Rubin did something again can be viewed as establishing that he had a documented history of using racially charged language. Plaintiff's Brief in Opposition at p. 8. Once again, after discovery plaintiff has not come forward with any prior incidents of a similar nature. Permitting the factfinder to draw such an inference without more would be nothing more than speculation.

Finally, plaintiff briefly raises an inference that defendant assigned plaintiff to difficult clients in retaliation for reporting Rubin. Id. at 3. This also is devoid of evidentiary support. There is no genuine dispute that plaintiff herself sought employment with defendant because of the cash bonus opportunity from working with difficult clients and that she herself pursued this opportunity after the incident with Rubin. The record indicates plaintiff engaged in voluntary discussions with Marbury regarding the assignment to difficult clients in order to obtain the bonus. And she has not come forward with any evidence that Marbury or anyone else gave plaintiff a more taxing client as opposed to other alternatives that were available at that time. Further, plaintiff testified that it was the stress from the difficult client that induced her to resign. Under these circumstances, the mere fact that one event followed the other does not supply a

causal relationship between the two. Nor does it supply a basis to infer that defendant made the assignment based on a retaliatory or discriminatory basis.

While it is clear that Rubin's word choice was ignorant, insensitive, and reckless, courts have routinely found similar and even more flagrant incidents lack sufficient severity. See Extanus v. Harbor Bar & Brasserie Restaurant, 386 F. Appx. 352, 354 (3d. Cir. 2010) (referring to the plaintiff as a 'Haitian F--k" was not sufficiently severe or pervasive to substantiate a hostile work environment); see also Fred v. Pennsylvania, 2015 WL 3875911, at *2-3 (M.D. Pa. June 22, 2015) (calling plaintiff a "f---k--g [Spanish epithet]" was not sufficiently severe or pervasive).

For the forgoing reasons, plaintiff has failed to establish a pervasive racially hostile work environment. The actual conduct advanced to defeat defendant's motion will not permit a finding that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficient to create an abusive work environment. At base, the environment plaintiff describes, although distasteful, is not so polluted with discrimination as to "destroy completely the emotional and psychological stability of minority group workers." Meritor, 477 U.S. at 66 (quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)). Nor is the conduct severe enough to transcend the restrictions that preclude Title VII from operating as a general civility code.[3]

For the reasons set forth above, defendant's motion for summary judgment will be

---

[3] Plaintiff also has failed to come forward with sufficient evidence to support her claims of retaliation regardless of whether such claims are considered independently or as part of her hostile work environment claim. As a result, defendant is entitled to summary judgment on these claims as well. Matsushita, 475 U.S. at 587.

granted. An appropriate order will follow. Date: September 23, 2025

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:  Graham Baird, Esquire
 Mary Lemieux-Fillery, Esquire
 Trisha A. Gill, Esquire
 Bridget Fitzpatrick, Esquire

 (*Via CM/ECF Electronic Mail*)

15